**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EROGE THOMAS,** | ) | **CASE NO. 1:07CV1430** |
| | ) | |
| **Petitioner,** | ) | **Judge Peter C. Economus** |
| | ) | |
| **vs.** | ) | |
| | ) | **Magistrate Judge Greg White** |
| **STUART HUDSON, Warden** | ) | |
| | ) | |
| **Respondent.** | ) | **REPORT AND** |
| | | **RECOMMENDATION** |

On May 16, 2007, Eroge Thomas, Petitioner, through counsel, filed in this Court a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  He challenges the constitutionality of his conviction in the case of *State v. Thomas*, Cuyahoga County Common Pleas Case No. CR440715.  This matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.2.  On October 31, 2007, Respondent filed his Answer/Return of Writ.  (Doc. No. 10.)  On February 22, 2008, Thomas filed his Traverse.  (Doc. No. 16.)  For the reasons set forth in detail below, the Magistrate Judge respectfully recommends Thomas' petition be denied.

## I.  Facts

The Ohio Court of Appeals, Eighth Appellate District, Cuyahoga County, set forth the facts underlying Petitioner's conviction as follows:

> Thomas' conviction results from an incident that occurred at his workplace on the evening of July 23, 2004.[1]  Thomas had worked at the Marriott Hotel in Cleveland, Ohio as a kitchen utility person for approximately a year by

---

[1]The correct date is July 28, 2003. (*See* Ex. 1.)

that time.

Thomas' employment duties were general in nature.  On a daily basis, he and the other two coworkers assigned to the second shift would clean the floors and wall areas of the kitchen, its offices, coolers, and hallway areas, wash large cooking pots, trays and preparation tables, operate the dishwasher, transfer food supplies, and empty trash barrels.  Additionally, utility workers were required to sweep the loading dock where the food supplies arrived.

Thomas had two immediate supervisors, viz., assistant chefs Amy Brin and Jameatra Mitchell.  Since Brin also was a kitchen manager, she generally directed the duty assignments.  One of Brin's colleagues, sous chef Daniel Scully, described her as "fair, but tough;" he indicated she held her employees to high standards of performance.  Thomas became more friendly with Mitchell.  As a result, Mitchell often permitted Thomas to work overtime hours.

In the months before the incident, Thomas began to complain to Mitchell and his coworkers concerning some aspects of his employment conditions.  First, Thomas believed the members of the first shift were leaving work for the second shift to do.  Second, he considered Brin to be not only disrespectful of him, but also to be "picking on" him.  Kitchen staff noticed that Thomas began arriving at the hotel early in order to survey the work assignments posted on the bulletin board.

On the day of the incident, Brin posted a work assignment for the utility team that stated the following:

> This needs to get done today, no exceptions or excuses!!!
> Michael Courtney, Michael G., and Thomas, all of you need
> to go down to the loading dock and clean it.  Sheet trays
> need to be cleaned.  Trash cans, sweep them up, all coolers,
> hallway, freight elevator, chefs' office.  This is to be done on
> a daily basis.  During down time, detail the kitchen, scrub
> walls, shelves, tables, legs, scrub walls on the coolers, clean
> racks.  Follow your schedules, no overtime.

Thomas, as was his habit, arrived prior to the beginning of his shift; he saw the posted work assignment.  When Mitchell arrived for work at 4:00 p.m., she observed Thomas and Brin near the chef's office, engaged in what appeared to be an argument.

Courtney arrived at work shortly before 6:00 p.m.  Thomas, indicating he took some umbrage at its message, personally accompanied Courtney to look at the work assignment.  Thomas complained to Courtney that the first shift people never seemed to get letters that gave them extra work, and that Brin had intimated the second shift was "ignorant."

As the men then began their duties, first taking the trash cans to the loading dock for cleaning.  Courtney noticed that Thomas was approached by the hotel's general manager, who inquired about his mood.  Thomas reassured

2

the manager; however, when the three second shift workers were alone, Thomas seemed unable to let go of his anger about the work assignment.

By 7:00 p.m., he was asking if one of them knew where Brin lived.  By nearly 8:00 p.m., he could no longer focus on his work.  He told Courtney that he was returning to the kitchen.  Courtney's offer to accompany him was rebuffed.  Thomas stated, "You don't need to go ***up there, because it ain't going to be nothing nice."  Thomas' tone caused Courtney to remain at the dock area.

Thomas entered the busy kitchen and approached Brin where she was working at the line table.  He asked to speak with her personally.  When she indicated she was too busy, he withdrew momentarily, but returned and told her he had to leave work early for a "family emergency."  Brin attempted to put him off to Mitchell; nevertheless, Thomas insisted Brin should handle the matter.

Brin acquiesced, but wanted Mitchell to accompany them to the chefs' office.  Once there, she sat and prepared the notation to grant Thomas' request.  Thomas seemed unsatisfied; he stepped up to the desk and asked Brin if she had called him ignorant.  Brin responded, "No, I said you had an ignorant mentality."

At that, Thomas struck her in the temple.  Brin initially was stunned by the action, then leapt up and ran from the office.  Mitchell's attempt to restrain Thomas from taking further aggressive action against Brin was unsuccessful; he shook her off and went in pursuit.

Other kitchen workers watched as Thomas cornered Brin, grabbed plates from the "prep table," and threw them, one at a time, at her.  When his hands were empty, he then took up from the same prep table one of the large kitchen knives that lay there.  Although she tried to escape, Thomas began stabbing her repeatedly; as he struck, he demanded an apology from her.

After receiving eleven stab wounds, mostly to her torso, Brin finally collapsed onto the floor.  Thomas left the hotel in the confusion that followed the incident, but he soon was apprehended a few blocks away.  One of his coworkers identified him as the man who had committed the assault.

Brin's subsequent autopsy demonstrated that several of the stab wounds were nearly seven inches deep.  Thomas was indicted on one count of aggravated murder in violation of R.C. 2903.01(A), with a repeat murder specification for his earlier conviction for that offense.

(Ex. 16, *State v. Thomas*, 2006 Ohio 280 (Ohio Ct. App. 2006)).

3

## II. Procedural History

Petitioner was indicted on one count of aggravated murder as defined in Ohio Rev. Code § 2903.01, with a repeat murder specification, making the crime a capital offense. The specification alleged that he had previously been convicted of murder in 1981. (Exh. 1.)

On February 24, 2004, after a jury trial on the aggravated murder charge, Petitioner was found guilty. (Exh. 3; Exh. 25, Vol. XI, Tr. 2,037). Subsequently, the trial court referred Petitioner to the court psychiatric clinic for a competency evaluation followed by treatment and reevaluation. (Exhs. 4-7.) In January 2005, the court psychiatric clinic issued a report finding him competent to stand trial to which the parties stipulated. (Exh. 8, Exh. 25, Vol. XII, Tr. 2101).

On January 20, 2005, the repeat murder specification was tried to the Court, per Petitioner's request, and he was found guilty. (Exh. 10, Exh. 25, Vol. XII, TR. 2101). On January 22, 2005, the jury recommended life imprisonment without possibility of parole, (Ex. 25, Vol. XIII, Tr. 2511), and the trial court subsequently imposed that sentence. (Ex. 11; Ex. 25, Vol. XIII, Tr. 2525, Case No. 03CR440715).

Thomas had different attorneys at the trial, sentencing phase and on appeal.

On February 11, 2005, Petitioner appealed to the Eighth District Court of Appeals raising the following assignments of error:

1.  Prejudice is presumed when the trial court denies counsel at the arraignment, a critical stage of the proceedings, in violation of *State v. Martin*, 103 Ohio St.3d 385, 2004 Ohio 5471, Syl. 2, Ohio Crim. R. 10 and 44, *Bell v. Cone*, 535 U.S. 685 (2002) and *Mickens v. Taylor*, 535 U.S. 162 (2000).

2.  The State's use of every peremptory challenge exercised on the exclusion of women from the jury violated the equal protection clause of the Fourteenth Amendment of the U.S. Constitution. Defense counsel's failure to object was constitutionally defective under *Strickland v. Washington*, 466 U.S. 668 (1984).

3.  The trial court erred in denying appellant's motion for a mistrial/new trial when it was discovered that original trial counsel did not conduct an adequate investigation of the appellant's emotional and mental state at the time of the offense, failed to investigate the cause of the appellant's seizures as a youth and failed to discover

4

the appellant's well documented history of psychosis. Trial counsel's conduct violated the Sixth and Fourteenth Amendments of the U.S. Constitution, *Wiggin v. Smith*, 123 S.Ct. 2526 (2003) and the ABA Guidelines for the appointment and performance of counsel in death penalty cases, 2003.

4.      There was insufficient evidence of 'prior calculation and design' to support a conviction of aggravated murder and the conviction was against the weight of the evidence.

5.      Counsel was ineffective under the federal constitution when he failed to cross examine Michael Courtney concerning his prior felony conviction and the trial court abused her discretion in denying the appellant the opportunity to recall Michael Courtney.

6.      The appellant's absence during a critical stage of the proceedings violated the Fourteenth Amendment of the U.S. Constitution.

7.      The cumulative errors deprived the appellant of due process under the Fourteenth Amendment of the federal constitution.

(Ex. 13). After briefing, the Court of Appeals affirmed the judgment of the trial court.

(Ex. 16). Petitioner filed a motion for reconsideration, which was denied.

On March 31, 2006, Petitioner, through counsel, timely appealed the denial of the motion for reconsideration to the Ohio Supreme Court. (Ex. 19). He raised the following propositions of law:

1.      Defense counsel's failure to object to the State's use of seven of seven peremptory challenges to exclude women from the jury is constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), *J.E.B. v. Alabama*, 511 U.S. 127 (1994) and *Johnson v. California*, 125 S.Ct. 2410 (2005).

2.      The Court of Appeals' material alteration of the appellant's assignment of error concerning the exclusion of women from the jury by the State is a denial of due process and the right to counsel under the federal constitution; the Court of Appeals' misstatement of the record is a further violation of due process under the federal constitution.

3.      There was insufficient evidence of 'prior calculation and design' to support a conviction for aggravated murder in violation of federal law.

4.      The appellant's absence during a critical stage of the proceedings violated the Fourteenth Amendment of the federal Constitution and the Court of Appeals statement that the record reflected a waiver was made by counsel is a violation of due process also.

5.      The cumulative effect of the errors deprived the appellant of due process under the federal constitution.

(Ex. 20).  The State filed a waiver of response.  (Ex. 24).  On June 21, 2006, the Ohio

Supreme Court declined to hear the case and dismissed the appeal as not involving any

substantial constitutional questions.  (Ex. 21, Case No. 2006-0659).

### III.  Petition for Writ of Habeas Corpus.

On May 16, 2007, Petitioner filed the instant Petition for Writ of Habeas Corpus,

through counsel, setting forth the following grounds for relief:

**Ground One**.  Defense counsel's failure to object to the State's use of seven of seven peremptory challenges to exclude women from the jury is constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), *J.E.B. v. Alabama*, 511 U.S. 127 (1994) and *Johnson v. California*, 125 S.Ct. 2410 (2005).

Supporting Facts: The State used 7 peremptory challenges and every one was used to strike a woman from the jury panel.  Defense counsel failed to object.  Petitioner's constitutional rights were violated under the 6th, 8th and 14th Amendment of the federal constitution.

**Ground Two**: The Court of Appeals' material alteration of the appellant's assignment of error concerning the exclusion of women from the jury by the State is a denial of due process and the right to counsel under the federal constitution; the Court of Appeals' misstatement of the record is a further violation of due process under the federal constitution.

Supporting Facts: The Court of Appeals materially altered the second assignment of error presented and fabricated a record to support its conclusion and deny relief.

**Ground Three**: There was insufficient evidence of 'prior calculation and design' to support a conviction for aggravated murder under the Fourteenth Amendment of the federal Constitution.

Supporting Facts: There was insufficient evidence of aggravated murder and prior calculation and design was not proven.  No evidence that homicide was planned with knife being instrument of death.

**Ground Four**: The appellant's absence during a critical stage of the proceedings violated the Fourteenth Amendment of the federal Constitution and the Court of Appeals statement that the record reflected a waiver was made by counsel is a violation of due process and Fourteenth Amendment.

Supporting Facts: Jury asked written questions during deliberations and wanted the transcripts of two eyewitnesses.  The judge conducted a telephone conf. With the attorneys but not petitioner.  Trial judge offered to have the testimony read to jury.  Trial counsel declined without consulting petitioner who was in jail.  The testimony was critical to "prior calculation and design."

(Doc. 1, Petition at ¶ 12).

## IV.  Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law."  *Ruimveld*, 404 F.3d at 1010, *quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir.2002).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id.* at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision

7

applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th 2006), *citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

Ineffective assistance of counsel exists when the attorney's conduct so undermines the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffective assistance of counsel claim, the petitioner must show that: 1) counsel's performance was deficient; and 2) the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.  *Id.*  Even if an attorney's conduct is found to be unreasonable and prejudicial, the Supreme Court will not find ineffective assistance where a defendant's substantive or procedural rights have not been affected. *Williams v. Taylor*, 529 U.S. 362, 391-93 (2000); *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993).

A federal habeas corpus court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) (*citing In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368))

As there is no issue as to exhaustion or procedural default, the Petitioner's grounds for relief will be reviewed on the merits.

## V.  Petitioner's Grounds For Relief and Analysis

### A.  Batson Challenge and Ineffectiveness of Counsel (Grounds One and Two)

Petitioner claims in his first ground for relief that his trial counsel was ineffective

for not objecting to the State's use of its peremptory challenges as to female jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).  In Petitioner's second ground for relief he argues that the Ohio Appellate Court fabricated the record in order to support its material alteration of his second assignment of error on direct appeal.[2]

The Ohio Court of Appeals denied Petitioner's *Batson* claim and the related ineffective assistance of trial counsel claim, as follows:

> Without providing this court with the numbers of men and women who composed the original venire, Thomas argues that the record reflects that the state excused from the jury only women without proper reason. *State v. Gowdy*, 88 Ohio St.3d 387, 2000 Ohio 355, 727 N.E.2d 579, footnote 2.  He further argues that defense counsel failed to raise an objection to the state's actions.  Both arguments, however, are belied by the record.

> The transcript of the voir dire demonstrates the prosecutor became aware during the proceeding that certain jurors indicated a reluctance when questioned about their view of the death penalty.  These jurors, for the most part, were women.  Although, for some, their answers apparently satisfied the trial court, the prosecutor was less sure.

> After the prosecutor had excused prospective Juror 16, a female, defense counsel objected, asserting a pattern of excluding women was beginning to take shape.  The prosecutor explained, 'Your Honor, quite frankly, my biggest concern is in fact this is a death penalty case; I keep going back to her answer on that.  There were a number of jurors [who] expressed a point of view that they believe God has the power to take and give life here.  And, quite frankly, that concerns me, whether its her or anybody else on this panel.  I just don't think in my professional opinion that *** she really is going to measure up to the task when and if we get to that point in time.'

> The trial court, as was its prerogative, accepted the prosecutor's explanation.  *State v. Gowdy*, supra at 394-395.  In addition, the court

---

[2]Petitioner states that the Court of Appeals materially altered the second assignment of error in its decision when it left off the word "every." [Petitioner's second assignment of error read as follows: The state's use of **every** peremptory challenge exercised on the exclusion of women from the jury violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, *J.E.B. v. Alabama*, 511 U.S. 127 (1994) and the Ohio Constitution.  Defense Counsel's failure to object was constitutionally defective under *Strickland v. Washington*, 466 U.S. 668 (1984)."]

9

reminded defense counsel that they were 'beginning to demonstrate a pattern as to white males being excluded from the panel,' and warned them to 'be careful.'  Thomas ultimately was tried by a jury which consisted of equal numbers of women and men.

Since the record thus reflects compliance with constitutional requirements, Thomas' argument is rejected.

(Ex. 16 at 8-10).

Resolution of this petition requires an evaluation of the interplay between the standard for determining ineffective assistance of counsel established by *Strickland* and the United States Supreme Court's application of the equal protection clause to peremptory challenges.  In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Court held that a prosecutor's use of peremptory challenges to eliminate potential jurors on the basis of race violated the defendant's right to equal protection under the Fourteenth Amendment.  Subsequently, the Court has expanded *Batson*'s reach to the use of peremptory challenges by criminal defense counsel, civil litigants, and to situations where the defendant and the challenged juror are of different races or gender.  *Georgia v. McCollum*, 505 U.S. 42 (1992) (criminal defendants); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991) (civil litigants); *Powers v. Ohio*, 499 U.S. 400 (1991) (defendant and potential juror of different races); *J.E.B. v. Alabama,* 511 U.S. 127 (1994) (gender).

Essential to any *Batson* challenge is a timely objection by defense counsel.  *Batson*, 476 U.S. at 99-100.  Once a *Batson* objection has been made, the trial court must inquire into the basis for the peremptory challenge.  The *Batson* inquiry follows the burden-shifting approach employed in civil rights cases:

First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of [gender].  Second, if the requisite [prima facia showing of gender based peremptory challenge] has been made, the burden shifts to the prosecutor to articulate a [gender]-neutral reason for striking the jurors in question.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

10

*Hernandez v. New York*, 500 U.S. 352, 359 (1991).[3]

Some courts of appeals have found a failure to timely object bars consideration of a *Batson* claim. *Abu-Jamal v. Horn*, 520 F.3d 272, 283 (3d Cir. 2008). The Fifth Circuit Court of Appeals held "[t]he evidentiary rule established in *Batson* does not enter the analysis of a defendant's equal protection claim unless a timely objection is made to the prosecutor's use of his peremptory challenges." *Id. (Quoting Thomas v. Moore*, 866 F.2d 803, 804 (5th Cir. 1989); *see also McCrory v. Henderson*, 82 F.3d 1243, 1249 ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); *Sledd v. McKune*, 71 F.3d 797, 799 (10th Cir. 1995) (concluding there was no basis to review a peremptory challenge when an objection had not been made in the state trial court). In *Thomas*, the court found it did not need to entertain the state's contention that Thomas's *Batson* claim was barred by a state comtemporaneous objection rule because "[a] timely objection . . . is requisite to a *Batson* claim." *Thomas*, 866 F.2d at 804.

In the instant case, the failure of Petitioner's trial counsel to raise a timely *Batson* objection precludes Petitioner from raising the issue at this time, unless he can prove an ineffective assistance of counsel claim. *See Thomas* at 804*; McCrory* at 1249*; Sledd* at

---

[3]Recently in *Snyder v. Louisiana*, __ U.S. __, 128 S.Ct. 1203 (2008), the Supreme Court held that a prosecutor's proffered reasons for striking a black prospective juror were pretext for racial discrimination. Furthermore, in order to establish a constitutional violation, a petitioner need only show that the prosecution struck one venire person for an unlawfully discriminatory reason. In *Snyder*, the Court focused on the third step of *Batson* and emphasized the trial court's "pivotal role in evaluating *Batson* claims." *Id*. at 1208. It acknowledged that a *Batson* inquiry involves an evaluation of the prosecutor's credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance. The Court further "recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province" and noted the deference accorded to the trial court. *Id*. (citations and quotations omitted).

11

799; *Davidson v. Gengler*, 852 F.Supp. 782 (W.D. Wisc. 1994).

This Court finds nothing in the record supporting the Appellate Court's statement that defense counsel objected to a state peremptory challenge "asserting a pattern of excluding women was beginning to take shape."   However, the record reflects that defense counsel did object to the peremptory challenge of Ms. Bennett, an African-American female, on the basis that it was racially motivated. (Tr. 1225.)  After some discussion, the Prosecutor then stated his neutral explanation based on the fact that a number of jurors expressed the belief that "God has the power to take and give . . life. *** and . . . that concerns me, whether its her or anybody else on this panel."  (Tr. 1227.)  The trial court accepted the explanation.

Furthermore, the Appellate Court stated that for the most part, it was the female venire members who indicated a reluctance when questioned as to their view of the death penalty.  Petitioner does not dispute this statement, and as state court factual determinations are "presumed to be correct" unless rebutted by the Petitioner with clear and convincing evidence, the Court may rely on the facts as set forth by the Appellate Court.  Clearly, the apparent misstatement by the State Court of Appeals regarding trial counsel's objection had no bearing on petitioner's claims of  error.[4]  As the Appellate Court stated, Petitioner was tried by a jury which consisted of equal numbers of women and men.  *See United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002) (final makeup of the jury is relevant to a finding of discrimination); *accord United States v. Yang*, 281 F.3d 534, 549 (6th Cir. 2002).

The United States Supreme Court has held that peremptory challenges may be used for any reason so long as they are not based on immutable characteristics such as race and

---

[4]The Appellate Court, treating the case as one in which an objection had been made, only served to cause an evaluation on the merits of the state's action in exercising its peremptory challenges rather than an evaluation on the issue of ineffective assistance of counsel.

sex.  *See Holland v. Illinois*, 493 U.S. 474 (1990).  A prosecutor can exercise a peremptory challenge for any nondiscriminatory reason, including a prospective juror's views regarding the death penalty.  *Dennis v. Mitchell*, 68 F.Supp.2d 863 (N.D. Ohio 1999).

In evaluating the prosecutor's explanation of race or gender neutrality, proof of discriminatory intent or purpose, and not merely disproportionate impact, is required to show a violation of the Equal Protection Clause.  *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991).  Unless a discriminatory intent is inherent in the explanation, the reason offered should be deemed neutral if facially based on something other than the race or gender of the juror.  *Id*. at 359-60; *Kelly v. Withrow*, 25 F.3d 363, 367 (6th Cir. 1994).  Indeed, the proffered reason need not be particularly persuasive, or even plausible, so long as it is neutral.  *Rice v. Collins*, 546 U.S. 333 (2006); *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (amended opinion); *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002).  In addition, the findings of the trial court on the issue of discriminatory intent are entitled to "great deference" because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly with a trial judge's province."  *Hernandez*, 500 U.S. at 364-65 (*quoting Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  This deferential standard is particularly apt in the habeas context, in which the presumption of correctness applies to factual findings made by the state courts.  28 U.S.C. § 2254(e)(1) (presumption of correctness, rebutted only with clear and convincing evidence);  *Braxton v. Gansheimer*, 2005 WL 5250052, Case No. 1:04CV0170, *7 (N.D. Ohio 2005); *see, e.g., Miller-El*, 537 U.S at 340; *Hernandez*, 500 U.S. at 366; *Dennis v. Mitchell*, 354 F.3d 511, 527 (6th Cir. 2003), *cert. denied*, 541 U.S. 1068 (2004); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003), *cert. denied*, 540 U.S. 1004 (2003).  Therefore the trial court's conclusion is not to be reversed unless it is found to be "clearly erroneous." *Hernandez*, 500 U.S. at 369; *Henderson v. La Marque*, 2002 WL 1034047, Case No. 003910, *4 (N.D. Cal. May 15, 2002.)

13

Petitioner argued that defense counsel was ineffective for failing to object to the prosecutor's peremptory challenges, all on women.  Specifically, he argued that seven females were removed from the jury (including two alternate jurors) without an objection by defense counsel.  Under *Batson*, Petitioner has the burden of proving purposeful discrimination.  *Hernandez*, 500 U.S. at 359 .  This involves a demonstration that the purported justification is merely a pretext for racial or gender-based motivation.  *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003).  Petitioner points to nothing in the record to prove purposeful discrimination.

The following is what the record reflects as to each challenged juror when the judge asked:  "Do you have any religious, personal, or philosophical thoughts or beliefs, or anything in your background that would prevent you from considering the imposition of the death penalty in a case if it were properly proven to you?"

Ms. Beltz responded: "I don't really believe in the death penalty at all."  (Tr. 221.)

Ms. Bennett responded: No, but the prosecutor proceeded to ask her about a comment on her questionnaire agreeing to the statement: "The death penalty should never be used as a punishment for any murder."  Her verbal response to the prosecutor was "I think in my heart I believe God gives life, God takes life."  (Tr. 416-417.)

Ms. Hatfield responded: "As I answered on the paper . . ., I believe . . .  only God has the right to give or take life."  (Tr. 478.)

Ms. Boczek responded: No, but when asked by the prosecutor whether she could fairly consider the reasons why, or why not, the death penalty should be imposed, she responded two times that she does not take the death penalty lightly.  (Tr. 526-527.)

As to Ms. Sullivan, she had stated during voir dire that her father was presently in the county jail for drug trafficking (Tr. 315), and she had been charged with felonious assault for stabbing her uncle.  (Tr. 319.)  She was also a part-time student at Tri-C.  (Tr. 315.)  As the record reflects, these reasons were the basis for the prosecutor's peremptory

challenge against Ms. Sullivan.  (Tr. 1226.)

Petitioner also argued as to two female alternate jurors who were excluded from the jury.

Ms. Salata responded: "I think I might have some problems with it, depending on the circumstances. *** I do hold some real religious convictions about . . . taking life of any kind, whether that's abortion or the death penalty."  (Tr. 746-747.)

Ms. Pyle responded: "No."  No other information was elicited from her that showed her viewpoint on the death penalty.  However, both attorneys spent a good deal of time explaining the jury process and inquiring as to her understanding of the process.  (Tr. 711-732.)

The record reflects that after defense counsel objected to a peremptory challenge on Ms. Bennett, the Prosecutor set forth a neutral explanation based on a number of jurors who were apparently equivocal on the death penalty due to religious beliefs.  The trial court accepted the explanation.

Respondent argued that even if trial counsel had not raised a proper *Batson* challenge, Petitioner was not prejudiced because the record demonstrates that the state court reasonably determined that the prosecution had a permissible explanation for the challenges. The prosecutor clearly explained his concerns with respect to jurors equivocating on the death penalty issue.  Had the objection been based on gender, the same explanation by the prosecutor suffices.

The test for determining prejudice on an ineffective assistance claim is not whether the outcome of the trial would have been different, but to ask whether the results of the jury selection process would have been different had a *Batson* objection been made. *Davidson v. Gengler*, 852 F.Supp. 782 (W.D. Wisc. 1994).  Petitioner points to nothing in the record to support his claim other than the suggestion that because seven women were excluded, there must be a viable *Batson* issue.  There is no evidence that a *prima facie* case

of discrimination ever existed and counsel makes no effort to establish one from the record.   Therefore, the Petitioner has not demonstrated that defense counsel was deficient or that Petitioner was prejudiced under *Strickland  v. Washington*, 466 U.S. 668, 687 (1984); *see also Robertson v. Brigano*, 1999 WL 1021588, Case No. 98-3290, *1-2, (6th Cir. Nov. 2, 1999) (defendant failed to show deficient performance by trial counsel that prejudiced the result in his case); *Alexander v. United States*, 1994 WL 702221, Case No. 93-2514, *2 (6th Cir. Oct. 3, 1994) (no indication that the elements of a prima facie case of race discrimination ever existed, or that counsel's performance was deficient.)

The decision of the Appellate Court rejecting Petitioner's ineffective assistance of trial counsel claim represents a reasonable application of the *Stickland* and *Batson* decisions and other relevant clearly established United States Supreme Court case law and a reasonable assessment of the record.  After a review of the record, this Court finds that Petitioner's first and second grounds are without merit.

**B.  Petitioner's Insufficiency of Evidence Claim**

Petitioner argued that there was insufficient evidence on which a jury could have convicted as to the element of "prior calculation and design."  Further, he argued that there was no evidence that the homicide was planned with the knife being the instrument of death.

The Petitioner was convicted of aggravated murder, defined in Ohio Rev. Code § 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another . . . ."  The Revised Code distinguishes between aggravated murder, defined above, and murder, which requires that one "purposely cause the death of another."  Ohio Rev. Code § 2903.02(A).  The sole difference between these two offenses is the element of "prior calculation and design."

The current § 2903.01(A) replaced the former premeditated murder provision in 1973.  In *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978), the Ohio Supreme

16

Court stated:

> The apparent intention of the General Assembly in employing [the] phrase ["prior calculation and design"] was to require *more than the few moments of deliberation* permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill.  Thus, *instantaneous deliberation is not sufficient* to constitute "prior calculation and design."

(Emphasis supplied)

Ohio courts consider three primary factors when determining whether prior calculation and design exist in a particular case: 1) whether the victim and accused knew each other and, if so, whether their relationship was strained; 2) whether the accused chose the murder site or weapon before the murder; and 3) whether the killing was a drawn-out act or an "eruption of events."  *Taylor v. Mitchell*, 296 F.Supp.2d 784, 821 (N.D. Ohio 2003) (*citing State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997) (*citing State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (1976)).

The crucial factor is whether there was sufficient time, under all the circumstances, for the accused to plan the killing:

> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*Cotton*, 56 Ohio St.2d at 8, 381 N.E.2d 190 (Syllabus ¶ 3).

Ohio courts have considered other factors – the defendant's relationship with the victim, the thought given by the defendant to the means and place of the crime, and the timing of the pertinent event – when determining whether a defendant meets the prior calculation and design threshold.

The Sixth Circuit recently ruled in a habeas case on the issue of whether there was sufficient evidence to prove aggravated murder under Ohio Rev. Code § 2903.01(A).  *See Gray v. Moore*, _ F.3d _, 2008 WL782467, Case No. 06-3547 (6th Cir. March 26, 2008). The Court of Appeals cited *State v. Taylor*, 78 Ohio St.3d 15 (1997) as support that

17

"neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but momentary deliberation is insufficient." Furthermore, the Ohio Supreme Court has recognized that some short-lived emotional situations can serve as the basis for finding the *mens rea* element of aggravated murder. *Id.* In *Gray*, the Court concluded that there was ample evidence of lingering animosity between the offender and the victim and the offender drove over an hour to get to the victim's house with a loaded handgun. Furthermore, the offender admitted to the shooting, did not call any witnesses on his behalf, and did not present any other evidence squarely contradicting the State's theory of aggravated murder. Therefore, the *Gray* Court concluded that the evidence in the record was more than adequate to resolve any doubt as to the fairness of his aggravated murder conviction.

The Ohio Court of Appeals addressed petitioner's insufficiency of evidence claim as follows:

> Thomas argues the state failed to sustain its burden to prove he committed the murder of Brin with "prior calculation and design;" therefore, his conviction for aggravated murder cannot stand.
>
> In considering a claim of insufficient evidence, this court is required to view the evidence adduced at trial, both direct and circumstantial, in a light most favorable to the prosecution to determine if a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 1997 Ohio 372, 683 N.E.2d 1096; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.
>
> The test to establish the element of 'prior calculation and design' is whether the evidence 'reveals the presence of sufficient time and opportunity for the planning of an act***, and the circumstances***show a scheme designed to implement the calculated decision to kill***.' *State v. Cotton* (1978), 56 Ohio St2d 8, 381 N.E.2d 190, paragraph 3 of the syllabus; see also, State v. *Moreland (1990)*, 50 Ohio St.3d 58, 552 N.E.2d 894; *State v. Taylor,* 78 Ohio St.3d 15, 1997 Ohio 243, 676 N.E.2d 82, citing State v. Jenkins (1976), 48 Ohio App.2d 99, 355 N.E.2d 825.
>
> ***
>
> The warning given to Courtney by Thomas, the length between the time Thomas first approached Brin and the time he managed with a falsehood to

get her into her office, his failure after his initial attack to permit her to escape, and the deliberate nature of the stabbing, all indicate the necessary 'studied analysis' of a plan and method of attack. *State v. Taylor*, supra, cf. *State v. Jenkins*, supra

(Ex. 16 at 12-14.)

Furthermore, the Court instructed the jury on "prior calculation and design: as

follows:

To constitute or be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death.

No definite period of time must elapse, and no particular amount of consideration must be given. But acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

(Tr. 1963, 1964.)

The critical inquiry on review of the sufficiency of evidence to support a criminal

conviction is to determine whether the evidence could reasonably support a finding of guilt

beyond a reasonable doubt. This inquiry does not require a court to "ask itself whether *it*

believes that the evidence at trial established guilt beyond a reasonable doubt." *Woodby v.

INS*, 385 U.S. 276, 282 (1966) (emphasis added). Instead, the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. *See Johnson v. Louisiana*, 406 U.S. 356, 362 (1972). "This familiar

standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in

the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

ultimate facts. Once a defendant has been found guilty of the crime charged, the

factfinder's role as weigher of the evidence is preserved through a legal conclusion that

upon judicial review all of the evidence is to be considered in the light most favorable to

the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

Petitioner contends that there is not sufficient evidence of "prior calculation and

19

design" to support an aggravated murder conviction under Ohio Rev. Code 2903.01, as the witnesses described an argument and an explosion of events in which the Petitioner grabbed a knife off the table in the kitchen and then killed the victim.

Petitioner relies on *Taylor v. Mitchell*, 296 F.Supp.2d 784 (N.D. Ohio 2003). In that case, the Judge held that the number of gunshots went to the element of purpose rather than the element of prior calculation and design. From the facts of *Taylor*, the court concluded that a rational jury could find that there was no "prior calculation and design," but only an "instantaneous eruption of events."

In *Taylor*, although the defendant and the victim knew of each other, there was conflicting testimony on whether there had been a serious or prolonged confrontation prior to the shooting. This led the Court to conclude that, as a matter of law, prior calculation and design would not have existed during the "pertinent time frame" just prior to the shooting. In the matter at bar, there is no dispute that the pertinent time frame was at least 2-1/2 hours between when Petitioner first became upset with Brin and the homicide. The record reflects that the first argument between the two was at 5:00 p.m. while it was not until 7:30 p.m. that the Petitioner told his co-worker he was going to the kitchen in order to confront the victim. Testimony was uncontroverted that the Petitioner continued to "rant" during that time frame and that he told his co-worker that what was going to happen in the kitchen ". . . ain't going to be nothing pretty, it ain't going to be nothing nice." This was no "instantaneous eruption of events" as the Court found in *Taylor*.

Respondent relies on the following facts to show that Petitioner had sufficiently calculated the killing of Brin: he asked where Brin lived; he told Courtney that he did not want to go to the kitchen with him because "things weren't going to be pretty;" he fabricated a family emergency in order to talk to Brin.

The appellate court's findings of facts are presumptively correct and are borne out by the record. It was clear that Petitioner was upset by the worklist that Brin, his

supervisor, had posted.  (Tr. 1885.)  He told his co-worker, Courtney, that Brin had called

him ignorant, apparently for not understanding her orders.  *Id.*  Another supervisor,

Mitchell, recalled witnessing an argument between Petitioner and Brin about 5:00 p.m. that

day.  (Tr. 1832.)  About 6:30 p.m., Petitioner asked a co-worker if he knew where Brin

lived and continued to "rant" about the list.  (Tr. 1897-1898.)  At about 7:30 p.m.,

Petitioner told Courtney that he was going to the kitchen but told Courtney not to join him

because Petitioner indicated to Courtney "it ain't going to be nothing pretty, it ain't going

to be nothing nice."  (Tr. 1907-1910.)

Next, Petitioner approached Brin in the kitchen and told her that he wanted to

speak with her personally.  (Tr. 1724.)  She indicated to him that she was too busy.  He

momentarily withdrew, but then returned and told her he had a family emergency and

needed to leave.  (Tr. 1725, 1814.)  At first, she asked Mitchell to handle the matter, but

Petitioner insisted on talking to Brin.  (Tr. 1860-1861.)  Brin agreed to speak with him and

they, along with Mitchell, went into the office, where Brin gave Petitioner permission to

leave work.  (Tr. 1815, 1817.)  Petitioner continued to talk – he complained about his work

conditions, specifically Brin calling him ignorant.  (Tr. 1817-1819.)  Petitioner appeared

calm throughout the discussion.  (Tr. 1861, 1850.)  Brin denied calling him ignorant, but

admitted that she had stated that he had an "ignorant mentality."  (Tr. 1819.)  He then hit

Brin in the head with his fist.  (Tr. 1820.)  Mitchell restrained Petitioner for a brief moment

which allowed Brin time to run out the door.  (Tr. 1821.)  Petitioner chased after her,

throwing plates at her.  (Tr. 1822.)  When he ran out of plates to throw, he picked up a

kitchen knife that was sitting on the line table and stabbed her multiple times.  (Tr. 1822-

1824.)  As he was stabbing her, he asked her to tell him that she was sorry; and when he

was done he turned towards Mitchell and Vitelli and asked them, "Am I ignorant?"  (Tr.

1824.)

After reviewing the record in the matter at hand, the Court finds that there was

sufficient evidence that would allow a rational trier of fact to have found all the essential elements of the crime. This Court cannot conclude that the trial jury lost its way. Accordingly, Petitioner's conviction was supported by sufficient evidence and his claim is without merit.

### C. Petitioner's absence during a critical stage of the proceeding.

Petitioner next argues that he was not present during a critical stage of the proceeding – when the deliberating jury asked by note whether it could review the testimony of two witnesses, Mitchell and Vitelli. Petitioner contends that these two witnesses were critical because of testimony they gave on cross-examination as to the incident – that it was "sudden and confusing;" "everything happened in a short span of time;" or "very quickly." (Tr. 1793; 1853-57.)

After the trial court received the jury's question, it conducted a telephone conference with counsel. Petitioner said that he was being held in the county jail and he had not waived his right to be present during all critical stages. The judge offered counsel the opportunity to have the testimony read as requested by the jury. All attorneys declined the offer and instead agreed to have the judge return a written response stating that the jury was to rely on their collective memories. (Tr. 2035A.)

A defendant has a constitutional right to "be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). However, the U.S. Constitution "does not require the defendant to be present when his 'presence would be useless, or the benefit but a shadow.'" *Cathron v. Jones*, 190 F.Supp.2d 990, 1001 (E.D. Mich. 2002) (*quoting Snyder v. Massachusetts*, 291 U.S. 97, 107-107 (1934); *overruled on other grds* by *Malloy v. Hogan*, 378 U.S. 1 (1964); *see also United States v. Brika*, 416 F.3d 514, 526 (6th Cir 2005) (citing Supreme Court authority and finding that a defendant's absence from the re-reading of previously given jury instructions did not thwart a fair

22

trial.)  A defendant's presence at a hearing is "largely a matter of form" when a defendant's lawyer is present at proceedings which raise largely legal issues.  *Cathron*, 190 F.Supp.2d at 1001-1002 (*quoting Fisher v. Rose*, 263 F.3d 906, 916 (9th Cir. 2001)).

Petitioner was not deprived of due process by his absence from the in-chambers conference on the issue of how to respond to a deliberating jury's question, as such conferences typically encompass purely legal issues and are attended only by the judge and counsel without the parties being present.  *See Buell v. Mitchell*, 274 F.3d 337, 363-64 (6th Cir. 2001); *Woodruff, Jr. v. Lafler*, 2007 WL 522704, Case No. 05-CV-74623-DT, *4 (E.D. Mich, Feb. 14, 2007).  This is particularly so where the defendant's counsel agrees to the answer given to the jury, as was the case here.

As Respondent points out, the Ohio Court of Appeals relied on *State v. Campbell*, 90 Ohio St.3d 320 (2000), *cert denied*, 533 U.S. 956 (2001), to reject Petitioner's claim.  The *Campbell* Court held that the sending of a note to the jury by the court is not a critical stage of the trial.  In *Campbell*, the jury furnished the judge with a question by note which he discussed with counsel in the absence of the defendant and then presented the answer to the jury by return note.  The *Campbell* Court stated that "a defendant benefits from his presence, and may be harmed by his absence, when instructions are given in open court.* * *  But these potential benefits and harms do not exist when the judge merely sends a note to the jury room."  *Campbell* at 346.  *See also State v. Ferguson*, 2006 WL 416614, Case No. 86439, *7, (8th Dist. Ohio Feb. 23, 2006); *State of Ohio v. Clyde Richards*, 2002 WL 31719258, Case No. 79350, *6, (8th Dist Ohio Dec. 5, 2002).  The *Campbell* Court concluded, in applying *Snyder*, *supra*, that neither the discussion nor the delivery of the jury note constituted a critical stage of the trial where defendant had a right to be present.

Furthermore, *Campbell* is supported by a Sixth Circuit case, *Buell*, *supra*.  In *Buell*, the defendant argued that he was deprived of his right to be present at all critical stages of trial when he was excluded from an in-chambers conference with the attorneys and judge

discussing a note from the deliberating jury.  The Sixth Circuit found that "[a] meeting similar to a bench conference at which the trial judge and counsel identified carpet samples is not sufficiently similar to jury instructions such that Buell's presence was required" and concluded that his absence from the proceedings did not violate his constitutional rights. *Buell,* 274 F.3d  at 364.

Based on the above case law, the Court finds that Petitioner's absence from the proceeding did not violate his constitutional rights.  Thus, Petitioner's fourth ground for relief is without merit.

## VI.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends Petitioner's petition be DENIED.

 s/ Greg White
U.S. Magistrate Judge

Date:  May 22, 2008

**OBJECTIONS**
**Any objection to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**